Good morning, Your Honors. My name is Cameron Ruber. On behalf of Appellants Larry Marshak and Florida Entertainment Mgmt, Inc., I have prepared my statements today to track my briefs, but if there's a particular issue the Court would like me to address ahead of time, I can do that. Well, we've certainly read the briefs, and we know that the history among and between the various parties is lengthy, which we're quite familiar with, as is the Second Circuit, and, of course, it's been here in the Ninth Circuit in various incarnations. So we don't need to have you repeat that. I mean, I do have a question, and I want to shortcut your argument, but just so you know, you don't need to march through all the arguments in your brief because we have read them. I would like to turn to the default judgment in Nevada in 2011, and my question is why that didn't trigger the Settlements Escape Clause? Well, in effect, if it did, the question remains, why didn't it get triggered in 1988 or since? And if that occurred, why did it not occur in 2001 in terms of the Ratio Dakota issue that we also briefed? We don't have an answer for that. We haven't had a definitive answer for that. If Ferb Reed has been the owner all along, according to his arguments that FBI never gained rights through any bona fide use, why did it take so long, almost 25 years, for him to assert his rights to a mark that he's alleged to use since 1952 or three? Well, when I looked at the settlement agreement, the 1987 one, it said that he couldn't use the name the Platters. I wasn't sure whether it precluded him from suing. How do you read that? Well, the Second Circuit actually recently in January effectively came down and indicated that he could sue definitively. I think the exact words were he wasn't precluded from suing in letter or in spirit, according to the 1987 agreement. So the agreement says he couldn't sue a venue, but it didn't say he couldn't sue on his trademark. Well, it was our argument before the Second Circuit and before this Court that Herb Reed couldn't trigger the escape clause himself on the basis of Race Judicata. He was in the 19 — he could have done so in 1987 if he had proceeded with the rest of the case, but I'm sorry. I misspoke. He could have proceeded with his claims in 1987 and said he entered a stipulation of settlement and all those claims were dismissed with prejudice. And then he proceeded in 2001 to reassert the claims that he had previously disclaimed again before the Court, and he lost on summary judgment as to those claims. Well, let me just ask you another question that's sort of an overview-type question that was puzzling me. So the name, the platters, which is what we're talking about, we know that it signifies the music recorded in 1960s by that group. And I guess that's still being played and sold and all that, the original recordings. But then there's also, and I guess what's at issue here, the live performances. But the live performances under the name, the platters, seems to have been done by various groups at various times all over the place. Is there any significance for trademark purposes left in that name, at least as associated with live performances? Well, according to the district court in 2001, I think expressly cited in her opinion there, no. Generally, in terms of likelihood of confusion in the marketplace, most consumers know that all of the platters stopped performing together many, many moons ago. And in fact, now that they're all deceased, I don't think there's any question anyone's going to expect to show up at a platter show, expecting to see any of the platters. In terms of live musical performances, most of the performers are always young or at least significantly young. Still alive. Still alive. There is that. I don't think there's any seances planned for any upcoming shows. But generally, there's no question in the minds of consumers that what they're going to see is a tribute band, whether or not it says tribute on the banner, for lack of a better description. And I think that all of the use over the years has diluted the mark to an extent where it may not be able to be used as a source indicator for the original band, per se. But definitely my client over the last 25 years has done everything that he can, either himself or through his predecessors, to consolidate the rights and to make himself a source for the goods that he's been using and performing. And let me ask you about that. So you claim the source, but all of the proposed sources seem to me questionable. So FPI, I guess there's been several court cases saying it never had a right to the trademark. And then I guess Tony Williams was enjoined from using the trademark. And so what is the source of any right you might have to the name The Platters? Well, there's an interesting dichotomy when you actually get into the opinion that we're arguing about today. Judge Due indicated that Herb Reed's rights were superior to FPI's because FPI defaulted in the Bennett default. And therefore, FPI had no rights according to the decision. If that's the case, then she also discusses where in a different part of the opinion, in 1982, FPI was determined to have superior rights to Tony Williams, who my client has claimed rights to since 2003. It seems inconsistent for the Court to say that if FPI had no rights, then Reed is superior to FPI. But if FPI had no rights, then Williams is still inferior to FPI. What do we do with the cases that say FPI, I guess there's a California case that FPI didn't rightly register the trademark or didn't have a claim to the trademark. And then the subsequent 2011 case saying, and FPI doesn't have any common law right to the trademark. That seems to sort of wipe FPI's claims to the trademark right out. Well, I think that the Second Circuit in 2001, 2 and 4 had a differing opinion when it came to those rights. And in fact, found that FPI and Marshak had superior rights to at least Herb Reed in this case with regard to that issue. And I think that insofar as that is considered race judicata in this case, I don't think the district court properly considered that. Well, going back to the question of the escape clause, you didn't quite answer why the Nevada judgment didn't trigger it. I mean, you said, well, maybe it did, but it should have been triggered earlier. Yes. Did I understand that right? That's correct. So from a legal standpoint, what's your basis for saying it should have or must have to have any validity have been triggered earlier? I'm sorry. Could you repeat the question? You're not answering it. Why do you say it has to have been triggered earlier or should have been triggered earlier? What's the legal basis for that? Insofar as the arguing that the default, sorry, insofar as the default judgment would have triggered the escape clause in 2011 as to Marshak or as to FPI, that issue should have been adjudicated well before 2011 pursuant to at least Herb Reed's 1996 case. Whether someone else, whether Herb Reed could assert that the escape clause was triggered to anybody else in the industry and as far as his rights or abilities is a different question. But I would argue that if it was triggered, it should have been triggered before. Well, is that tied in at all with your laches argument? Entirely. And there — And just to — Go ahead. I've mangled this argument sufficiently, but I have two separate tracks of thought that I'm trying to keep consistent. All right. Generally when it comes to the escape clause, there are no facts that were presented in 2011 to the court for default that could not have been presented in 2001 or in 1996 or even in 1988. So to the extent that the escape clause was triggered for any particular reason in 2011, there's no indication that it couldn't have been triggered well before then. So all the escape clause does, as I read it, is to say the settlement agreement to the extent that it doesn't let them use the platter's trademark is of no further force or effect, correct? And that's the exact same interpretation that the court in New York effectively came down with. In fact, I think the exact interpretation was that the only thing it says is that Herbreed can resume use. I think that's a direct quote. So I'm looking for, under a laches argument, I was — what puzzled me about — well, many things puzzled me about this case. But one thing was the — Herbreed, rather than litigate the rights to the trademark with FPI back in 1987, voluntarily entered into agreement saying, I won't use this name. And so I was trying to see if there were cases saying, what's the effect of voluntarily disabling yourself from using the name with a laches argument? In other words, can you — can you raise a laches defense because — because of this long delay that was voluntarily entered into? And I couldn't really find a case either way. Have you seen anything that would say you can't use a laches defense? I have not, Your Honor. But it seems it would be very hard to find, from an intuitive standpoint, considering that the — the sine qua non of trademark law is use in commerce and ability to control the goods that are being used with the mark. If you're voluntarily surrendering any control over those goods, I don't see how you can assert yourself as an owner of a trademark for very long. And I think that's why it's — the Trademark Act is written the way it is. So — so on the — that's more of the abandonment issue. And one of my questions there was, Herb, we continue to get royalties from the — the original performance records. As did the other platters. But — but not as to the live performances. So could you abandon — can you bifurcate abandonment in that way, so you could abandon your right to use the name for live performances while still using the trademark for the original performances? I don't think there's any reason that you couldn't. I mean, generally, there's concurrent use with regard to marks in the marketplace. It's — it's actually pretty prevalent. Well, wait a second. If — if you are using — a mark is a mark. I mean, there are some concurrent uses, but they may be sanctioned and they may not necessarily be sanctioned. But if they're in — if they're confusingly similar, then there's not going to be concurrent — there is not concurrent marks. So in this case, if they are still operating in interstate commerce in terms of receipt of royalties, I was having some trouble understanding how that could be construed as abandonment under any definition of abandonment that's been used in the trademark law. So maybe you can enlighten me on that. I mean, they're getting royalties, correct? They are getting royalties. That's in interstate commerce? That's interstate commerce. And it's a use of the mark? That's the use of the mark. So how can it be abandonment? With regard to control of the mark, the — the actual import of a mark is the ability to control the goods and services provided under it. If you're not controlling the mark, you're effectively abandoning your rights to do so. So we have these naked licensing cases, BarkAmerica, there's a couple, which say if you give a license to use your trademark and then have no control over it whatsoever, we deem it to be abandoned. But there's not a license here. Would you characterize a 1987 agreement as a license to use the trademark? Well, my understanding of the 1987 agreement was that Mr. Reed surrendered all right and title that he may have had to the Platters at that time to FPI and then took a license back for Herb Reed and the Platters, or to use Herb Reed and the Platters. So he surrendered anything that he might have had at that time and then took a license for a different mark entirely and agreed not to use the mark whose rights he had surrendered. Do you want to save the remaining time for rebuttal? Oh, I'd like to. I'd like to ask a question, if you wouldn't mind, before you leave. We're here on a preliminary injunction. Is that correct? Yes, sir. What has happened in the trial court since the preliminary injunction was rendered? We've almost completed discovery. We've got party depositions to take, I believe it's next week, and then discovery will close. And we have to go and move into expert discovery and dispositive motions. The trial is set for some time in the summer. Thank you. Well, it hasn't been set, but the court would expect it to. Thank you. Thank you. May it please the Court. My name is Eric Summers. I'm here for Herbreed Enterprises. With me is co-counsel John Krieger from Lewis and Roca, Nevada. I just wanted to address a couple of points. First of all, an argument that was that I heard, I think right at the outset from opposing counsel, that Herbreed for 25 years did nothing. And I think the case law is pretty clear, even in this circuit, that Herbreed spent a lot of time over the, since 1987, there are a number of decisions, including some appeals here, that involve his litigation of rights, trying to protect those rights. So I think that mischaracterizes what happened. It's just simply not true that he just sat for 25 years and did nothing. So what cases are you referring to? There's the Roe v. Reed case that was, I believe, that came out of Nevada. There was also the 1996 case out of New York. There were some other skirmishes here and there. Those are the two I remember right off, but I believe he was also involved in a subsequent case, not only just the Roe v. Reed. There may have been a number of cases over a period of years there as well. Could I ask you a mundane question? Sure. You're here to defend a preliminary injunction. Correct. I want to ask you about whether there was a showing of irreparable harm before the district court. I believe so, and I think we spelled that out. We list the facts. We list the facts in the brief as to what those were. The showing of irreparable harm had to do with the use of the infringement on the goodwill and the use of two parties using essentially the same goodwill now that Mr. Reed has triggered the escape clause, resuming use for performances of the platters to the exclusion now of the finding of likelihood of success, to the exclusion of the other party. Up until recently, you've been able to rely on a presumption. That no longer exists. Did the district court make findings or did he follow the presumption that in a trademark case there is irreparable harm? No. And Judge Du was very careful about that. If you read her opinion, what she was, she apprehended the law, which is what she needed to do. She understood that there was no presumption, and she precisely said, I'm not, that presumption does not apply. And therefore, she listed a number in her findings. She actually applied the new eBay. Exactly. She was very careful to do that. Was there any evidence presented? Because it seemed like the findings were the sort of findings you would have in any claim of trademark infringement. And I didn't see whether you had presented any evidence showing actual harm or expert reports or any information like that. Was that presented? There were no expert reports. There was nothing that extensive. The Court, I guess, did not feel, felt that she could rely on the affidavits. And because this case has so much history, there's also, she could take judicial notice of certain other decisions having to do with that balance. But the claim, I guess the one problem is when we used to have trademark cases, all you had to do is show up, and if you could win on the substantive part, then you would automatically win on the irreparable injury. It would be presumed. And all you had to do is say there would be irreparable injury. But you're saying that there, I think in the affidavits, as I recall, there is, there are statements to the effect of what would be the impact, correct? That's correct. And specifically having to do with the goodwill, the ability to use the mark. And I believe also she, Judge Adu looked at a prior decision, including, again. Where can I find the findings of fact that she made? If I may, Your Honor. They're listed in the Appelese brief, and I'm looking for the page, but I set them out as bullet points just to make it clear to the Court. On page 32 of the Appelese brief, I make a listing of the evidence that was presented to the Court. And her findings that are, and with the citations to the record. Okay. Thank you. Would you, let's go back to the, one of the first questions that your opposing colleague posed to us, and that was, he kind of sidestepped my question on, well, what about the 2011 Nevada default judgment? Does that trigger? And he said, well, even if it did, you were lying in the weeds way back when. And it should have been triggered, I think he said, in 1987, or following the 1987 agreement. What is your answer to that? Well, whether there would have been a cause of action that would have arisen that would have allowed that case to go forward or not is a question of fact. So there's nothing that would have forced us to go back right away. And, in fact, as we argued in New York, when they were, they came and they argued that this was a violation of the injunction, it was bad faith. I even posited to the Court there that if we had entered into stipulation and immediately tried to undo that stipulation, that probably would not have been good faith. However, by going in when there was a cause of action, there was a number of litigations afterwards. And, in fact, we tried to trigger that. We tried to argue that that escape clause had been triggered by this Court in the Powell decision in 1996, in the 1996 case in New York, and the Court said it wasn't sufficient for that. So you're saying there wasn't a predicate for actual triggering before? That's correct. And it wasn't until there was a cause of action that arose that Mr. Reed felt he had against FPI in 2010 that he actually went and sued, and it was as a result of that lawsuit. It wasn't a lawsuit that is instituted, as they seem to indicate, to trigger the escape. It was to rectify the harm that was going on under the very 2001 injunction in the prior stipulation, which prevented each party from interfering with the other party. And if I may on that, I disagree with their characterization of what that agreement was. It was a stand – essentially, it was a leave alone agreement. The 1987 agreement? The 1987 stipulation of 2001. You leave us alone, and we'll leave you alone. It doesn't really say that, right? Because you agree not to sue a venue, but you don't agree not to sue anybody else. There's no – there's no – nothing that says we won't sue you. That is true. But usually what was happening at that time is somebody would go and perform. And the reason why it was drafted that way is one of the parties, FPI, Five Platters Inc., which was the parent company run after Herb Reed by, you know, by the OD manager and his secretary, and all these – the different former platters, and what – to stop them, they would go and sue the venue to get – to get these individuals to stop. So it was really a circumstance that was – the agreement was dictated by the circumstance at the time. The 2001 injunction, if you read that, says there can't be interference with use of FPI's mark. And if I may, I just – I'm sorry. I guess I'm still confused, and just going back to the latches and abandonment questions, because here Herb Reed voluntarily, instead of litigating the rights to the trademark, voluntarily says we won't use the name The Platters. And I guess I'm sort of struggling to see the implication of an escape clause where it seems almost like it doesn't matter because Herb Reed agreed not to use The Platters, and somebody else then relied on it and used it. And I'm not sure why latches wouldn't be a viable defense. Maybe you can explain that. It's not that he didn't agree not to use The Platters. Well, that says right here. It says, Herb Reed shall not use the name The Platters. That seems to be the gist of the agreement. He was not supposed to perform using just The Platters. He could use it qualified with his name as a way of – in a sense of distinguishing between 5 Platters, Inc., which was calling itself either the – at the time, either 5 – either The Platters or The Buckram Platters or some variation. And Herb Reed, unlike Tony Williams, for example, was completely enjoined for using the mark and has no rights. Herb Reed could still go ahead and use The Platters. He had to call it – he had to add his name to it. And so in that sense, he's not giving up all use. It's a concurrent use, as the Court noted, with the ability, if 5 Platters, Inc. was determined in some later litigation to not have that, to resume full use unfettered without having to qualify it any further. But it was a voluntary agreement not to use that name, which I thought is what's at issue here, which is sort of puzzling to me. That's correct. It was a – it was a settlement of litigation. So you are correct. It was a voluntary settlement. Then the question is, what's the status of The Platters all by itself if he – he needs to use it with a qualifier, correct? Correct. Until what time? Until such time, as the escape clause says, until such time as FPI is deemed Without the right – any rights. Without any rights, with all due respect. And then your position is that they kind of march along, and then the Nevada judgment takes – that that triggers? Or just before that had triggered the escape clause? That triggers the escape clause. That's correct. And at that point, it's sort of solidified what this Court has said – essentially confirmed what this Court has said in 2001 in the Powell case, which was FPI since 19 – by Platters, I think since 1970, had – had been fraudulently using the mark. And the only way that it could really have any common law rights at all in that mark would be to have used a proper qualifier that was not – that distinguished it from the original group. And – but, again, New York, in ruling – in its case, said that wasn't quite enough to trigger the escape clause. And since then, nothing has happened to show that there's actual rights, and that's what Nevada found. Not only was there a default there, keep in mind, but there was a summary judgment. And the Court looked at the evidence presented, and in – Judge Mahan in Nevada ruled that there had not been a showing by Phi Platters, Inc., or by its president, Gene Bennett, at the time, that there was ever rights to that mark by FPI. Let me ask you the same question I asked opposing counsel. So we know that there is the Platters that relates to the 1960s group, and their records are still being sold and performed and the like. But on the performance name of the Platters, of the live performances, given this history of use, is there any significance left of the Platters as a trademark? There is, absolutely. And the reason why – and if you look at probably the most succinct summary of what that is, or the concept behind that, is Judge Cody's decision in Marshack v. Schaffner, where she talks about the trading off of – the goodwill that's being used is the identical goodwill that's embodied in these recordings. And so you can't split the – you can't split the goodwill between music that everybody hears. And remember, people listen to recordings. So you're listening – that's how people know the music. There are millions of records. The source identification is the music. The source identification is the records. But for the live performances, as opposing counsel was saying, everybody is now dead. And there have been live performances by various groups of various people over these 20 years. So what is the source identification with respect to the live performances? I think everyone knows that it's not the original Platters. But it's still tied – the idea is that there's still either – you don't have to have the original to still have the endorsement. And trademark means something. It means quality. It means a certain level of – it's the identifying part of the goods. Well, there's successors and rights to that, correct? Correct. So it doesn't change. It does not change. And a superior – a person who has superior rights has the right to control that to the exclusion of others. But so Herb Reed didn't do that, didn't control it for, you know, the 20 years of when it was – after it had entered into the settlement agreement, correct? Well, he certainly controlled the source of that. Does that matter? Because the source of that were the original recordings. And he controlled the quality of those goods because he was part of it. He was the only person – the only member of the original group to have been on every single recording. But not the live performances. So he didn't control – nothing – at least nothing in this agreement suggests that he was controlling the quality or anything about the live performances. He could not control somebody else's live performance. That's correct. But what that means also is you can't split – you're asking for creating independent goodwill. There can't be any independent goodwill created in a live performance that's based off of the goodwill of the original recordings and the original group. I guess maybe the question is this, but I think maybe a different way of asking what Judge Acuti is asking is not if you were to split somehow the right, which I don't think you can – the trademark doesn't somehow get split. But whether it's diluted to such a sense that it then no longer retains source identification. So I think that's maybe a different way of asking it. And maybe you could respond to that. I can. In the response, I believe Judge Du recognized the fact that there's been fights about the value of this mark. And everybody who's using it, unqualified, including Mr. Marshak, argues that if he can't use it in its pure form, he will have to – he will lose business. He can't – and he will lose business by having to use his own name. So there clearly has to be some value in the mark. It can't be diluted to oblivion if it still has value when you're using it by itself. So in other words, let's take this, that you can – someone can go out and perform the music without using the name, correct? Assuming they get the license. Correct. Or, you know, pay the license fee. So if somebody goes to Las Vegas and decides they want to do some kind of show, they would be able to get – presumably get a license to sing and perform the music, correct? That's correct. But they wouldn't necessarily need to use the platters as part of their name to promote the show, correct? That's correct. So that's one scenario. But if they do use the name platters, I mean, what if somebody goes to Las Vegas and they say some unknown singer, a night with the platters, you know, historic music and memorabilia, you know, from the 50s, would that be a trademark infringement or no? I believe it is. I believe that – and again, I believe it is for precisely the reasons I said before, and I also believe that that's what – and I'm bringing this as a tangent, but I believe that that's why numerous states have passed this truth in music law, which is to say, we're going to define what this is. You really – we're trying to protect the consumers. Just to be clear for the consumers, if you are a tribute group like they say they are, they should identify themselves as that. That's all we're saying. They can call themselves a tribute group. They can still use the name, but just identify yourselves to the consumer so they know that you're a tribute group, so that the casual consumer who's going to Las Vegas for a show is not thinking, this is some connection to this famous group. I heard them when I was a kid. Cool, I'm going to go see them again. Not necessarily thinking it out, saying, hmm, I wonder how long ago that was. I listened to the music, et cetera. And so, this is – it's a consumer protection issue. And the senior user has rights to respect. So to speak, the senior user. Exactly, Your Honor. I am out of time, so I'm happy to answer any more questions, but I'm clearly out of time. Thank you. Thank you very much. I've only got a minute left. I just want to address the most recent point, the consumer protection issue. I think it's a disingenuous argument, only to the extent that Herb Reed specifically in 1987 disavowed any rights he had to the mark of the platters to FPI. That's right there in the 87 agreement. He took a license back that he would perform pursuant to the strictures of FPI. FPI was controlling the mark by Herb Reed's own agreement at that point, and that's how the parties proceeded thereafter. Throughout 2001 and throughout 2010, until the escape clause, or at least the Bennett default occurred. So to the extent that he's protecting consumers 25 years later after surrendering the right in the first place, I just don't think it's a very effective argument in this particular situation. And if there's any other questions, I'd be happy to answer them. Thank you. I'd like to ask you a question. I asked counsel about whether or not there's a presumption being used, whatever you call it, or whether there's actual facts that the district took, district court took. And as I read what the district court did, there was damage, the district court thought, to Reed's legacy, but I didn't find any factual determinations about Reed's legacy. So I wanted to give you an opportunity to find out your view as to whether or not a presumption was used, which can't be used, or whether there was a factual basis for it. I believe that the court looked at the affidavits and drew conclusions from them. But as of part two, any other factual findings, I don't believe that there were any made. Especially considering she took judicial notice that Herb Reed passed away about a month before the oral argument, after the papers were submitted. Any damage to his legacy at that point, I thought, would be minimal between now and the end of whatever this case is. Did you object on that basis when you talked, when you were arguing to the district court, did you object on that basis? I'm sorry, Your Honor. Did you object on that basis when doing the argument to the district court? Let me confirm with co-counsel. I want to confirm my understanding. My understanding is that we did. What's the matter that he passed away, though? What's the matter that he passed away? Because it doesn't mean that the rights go away. During the course of his lifetime, if there was a legacy to be protected, if he was being personally injured by someone else allegedly using his mark to his detriment, that's one thing. But if he's already passed away, in terms of his legacy and him being able to protect it during his lifetime, I think that's mitigated by his death. Assuming that the opposition is right and the case is properly before us, our standard of review is abuse of discretion, right? Yes, Your Honor. So we're not going to tell you how this case is supposed to come out. We don't have to make these life-changing decisions as to the law. We just have to find out whether the district court abused its discretion in holding time out until the final decision comes up. I'm having difficulty seeing an abuse of discretion. I understand your argument, and you may well convince the district court in the X number of months when you go to trial. But how is the district court really abused discretion? The most prominent abuse of discretion here is attributing ownership of the mark, the platters, to Herb Reed on this record. But she doesn't have to find that. The district court only has to make a tentative ruling. But there's a likelihood that he'll succeed on the merits on that issue. But the only evidence to the effect that I can tell on the record that was submitted that he owns the mark, he individually owns the mark, are royalty statements. And not even the royalty statements were submitted. An affidavit from a CEO of the corporation saying, I know that he has received, that Herb Reed has received royalties was submitted to that effect. And he's only been with the company since 2005. But Herb Reed is also one of several platters that are receiving royalties. So his ownership would be diffuse among the rest of the platters, including Tony Williams, whom I claim has accepted rights from since 2003. I suspect we could, instead of us deciding, we could go down to the Las Vegas and see what sort of odds they'd put on it. But it strikes me that the actual, that you're arguing for what you will argue for at the end of the case. And I'm, my main question with the case here is whether or not there was, it's close enough that whether there was abuse discretion for the determination to be made, we're going to do timeout this way until the actual determination takes place. Well, I think that the purpose of, that the primary purpose of the preliminary injunction was to maintain the status quo until the parties can determine how things actually shake out. The status quo for the last 25 years. The status quo is sort of a civil war, but I think armistice is probably a better. For the last, well, arguably for the last 25 years, the rights to the platters as to, between Marshack and Mr. Reed, Marshack has consistently come out on top and expressly come out on top in 2001, 2002, and 2004, the Second Circuit. So the odds are pretty good in Las Vegas. Well, I guess you don't want to change venue, but let me just go back and ask you, I'm a little hard pressed to understand why somebody's death actually dilutes the legacy, because we have a lot of rock and roll legacy where the people are dead. In fact, sometimes it enhances it. So. Well, perhaps. And I'm not asking you from a factual basis. From a legal basis, what's the. . . I may have misspoke or possibly confused you. I'm actually pretty good at that today. But generally it was the harm that I was saying was disused. The harm to Mr. Reed was significantly reduced or mitigated by his death in terms of any abuse to his legacy. If he's alive and he understands that things are going on, I can understand a need to move quickly or rapidly and proceed with preliminary injunction proceedings. But if his death has come along, I don't think there's any real change or need to change the status quo in order to affect that. Okay. I think we have your points in mind. Any other questions? All right. Thank both counsel for your argument this morning. The case just argued. Herb Reed v. Florida Entertainment is submitted.
judges: Wallace, McKeown, Ikuta